978 F.2d 1541
 61 USLW 2315
 The FEDERAL DEPOSIT INSURANCE CORPORATION,
Plaintiff-Appellant and Cross-Appellee,
v.
Glen B. CLARK, Jr.; Hamilton, Myer, Swanson, Faatz & Clark;
and Robert K. Swanson, Defendants-Appellees and
Cross Appellants.
 Nos. 89-1342, 89-1343.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 22, 1992.
 
 1
 Robert D. McGillicuddy, Washington, D.C. (Todd L. Vriesman, Kirkland & Ellis, and Gary Cornwell and Kent E. Hanson, Cornwell & Blakey, Denver, Colo., on the Brief), for plaintiff F.D.I.C.; John Thomas and Joan S. van Berg, F.D.I.C., Washington, D.C., of counsel.
 
 
 2
 Kenneth C. Groves, Denver, Colo. (Philip A. Rouse, Jr., and John S. Butcher, on the Brief), for defendants-appellees and cross appellants.
 
 
 3
 Before McKAY, Chief Judge, and TACHA, Circuit Judge, and BROWN, Senior District Judge.*
 
 
 4
 WESLEY E. BROWN, Senior District Judge.
 
 
 5
 This action was brought by the Federal Deposit Insurance Corporation against two attorneys, defendants Clark and Swanson, and their law firm, to recover damages sustained by the Aurora Bank, a Colorado state bank, which was closed on November 1, 1985, when the Colorado State Bank Commissioner determined that it was insolvent.
 
 
 6
 The losses to the bank arose from a fraudulent conspiracy, known as the "heist money scheme," which involved the purchase of stolen money through bank loans procured from the Aurora bank. The defendant attorneys were not personally involved in the fraud, but the jury found them to be liable for negligence in their capacity as attorneys for the bank.
 
 
 7
 The claims against the defendant attorneys were brought under Colorado state law for professional negligence and/or for breach of an implied warranty of professional capacity and ability.
 
 
 8
 In a bifurcated trial, the jury first found that both defendants Swanson and Clark were "negligent or at fault by breach of implied warranties," and that such "negligence or fault" was a cause of loss to the bank, and that both were acting in their authority as partners in the defendant law firm.
 
 
 9
 In addition, the jury fixed proportionate liability among defendants and others not named in the case, finding that Clark should be charged with 14% and Swanson with 5% of the damages arising from negligence.
 
 
 10
 In the second phase of the trial, the jury found that the damages sustained by the bank between October 18, 1984, and December 20, 1984, were in the total sum of $914,013.19. In accordance with the verdicts of the jury, judgment was entered against the defendant Clark in the sum of $127,961.80, against Swanson in the sum of $45,700.00, and against their firm, Hamilton, Myer, Swanson, Faatz & Clark, jointly and severally.
 
 
 11
 In this appeal, the defendant attorneys claim that the district court lacked subject matter jurisdiction, that they are not responsible for damages because their client, the Aurora Bank, by and through its dishonest agent, Nowfel, provided them with false information, that the case should never have been submitted to the jury because there was no proof that they were engaged to perform the duties alleged to have been breached, that they were not negligent and breached no duty, that they cannot be liable for representing potentially conflicting interests when their client consented to dual representation, and when there was no conflict of interest, and that the jury was erroneously instructed on causation.
 
 
 12
 The plaintiff FDIC has appealed upon a claim that the district court should not have proportioned liability, that the damage phase of the case was conducted improperly, and that the damage verdict was inconsistent and insufficient.
 
 Jurisdiction
 
 13
 The initial issue for our review is defendants' claim that the district court lacked subject matter jurisdiction because at the time the complaint was filed, April 27, 1988, and at the conclusion of the liability phase of the trial, July 18, 1989, the FDIC was asserting the rights of a state bank, and therefore could not prosecute this action in federal court in its corporate capacity.
 
 
 14
 In this respect, defendants allege that since the bank's claims arise from a personal service contract, a claim not assignable under Colorado law, the assignment was invalid; and under such circumstances, the FDIC can only sue on the contract in its capacity as receiver of the state bank. In overruling defendants' motion to dismiss for absence of subject matter jurisdiction, the trial court found that the Tenth Circuit had "recently reestablished the law regarding the validity of assignments from FDIC/Receiver to FDIC Corporation," citing Federal Deposit Ins. Corp. v. Bank of Boulder, 911 F.2d 1466 (10th Cir.1990), opinion on rehearing en banc, cert. denied --- U.S. ----, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991).
 
 
 15
 Prior to August 9, 1989, when the FDIC brought a suit in its capacity as a receiver of a state bank, asserting the rights of the bank and its depositors, shareholders, or creditors, the FDIC was required to bring its action in state court. 12 U.S.C. Sec. 1819(a) (Fourth) (1982), and see Federal Deposit Ins. Corp. v. Bank of Boulder, 865 F.2d 1134, n. 1, p. 1135 (10th Cir.1988), opinion on rehearing, en banc, Federal Deposit Ins. Corp., v. Bank of Boulder, supra.[1]
 
 
 16
 Title 12 U.S.C. Sec. 1819(a) (Fourth) (1988) grants FDIC the power:
 
 
 17
 To sue and be sued, complain and defend, in any court of law or equity, State or Federal. All suits of a civil nature at common law or in equity to which the Corporation shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof ... (emphasis supplied).
 
 
 18
 There is an exception to this broad grant of federal jurisdiction in FDIC cases, in that "any suit to which the Corporation is a party in its capacity as receiver of a State bank and which involves only the rights or obligations of depositors, creditors, stockholders and such State bank, under State law shall not be deemed to arise under the laws of the United States." (Emphasis supplied). 12 U.S.C. Section 1819(a) (Fourth) (1988), and see, Bank of Boulder, supra, 911 F.2d at 1471.
 
 
 19
 Defendants' argument is that upon appointment as receiver by the Colorado State Bank Commissioner, the FDIC acquired no greater rights than possessed by the bank, and since the bank could not "sell and assign" an attorney malpractice suit, neither could its receiver.
 
 
 20
 In view of the Tenth Circuit en banc decision on rehearing in the Bank of Boulder case, supra, 911 F.2d 1466, it is clear that the district court had subject matter jurisdiction under 12 U.S.C. Section 1819(a) (Fourth). There, the FDIC, which was appointed as receiver of the bank by the Colorado State Bank Commissioner, sold "acceptable" assets to another bank; and, in its corporate capacity, purchased one of the "unacceptable" assets, a letter of credit issued by the Bank of Boulder. When the FDIC, in its corporate capacity, attempted to draw on the letter, the new owner of the bank refused to honor the drafts, and the FDIC filed an action in federal court to enforce the letter of credit. It appeared that under Colorado law, the letter of credit was not transferable. The district court found that the FDIC could not acquire or enforce the letter in federal court but would have to bring suit on the letter in state court in its capacity as receiver.
 
 
 21
 The only issue presented on appeal in the Bank of Boulder case was whether the FDIC/Corporation could purchase a letter of credit from the FDIC/Receiver, notwithstanding the fact that the letter was not transferable under state law. In finding that the federal court had jurisdiction of the case, and holding that federal law preempted Colorado law which prohibited the assignment of letters of credit, our circuit reviewed the alternatives that the FDIC/Receiver have when a state agency finds an insured bank to be insolvent. These alternatives include a straight liquidation of the bank in which the FDIC sells the assets of the failed bank and pays off the depositors from the proceeds, making up any shortfall from the insurance fund. In an alternative "Purchase and Assumption" plan, which is the situation of the Aurora Bank, three parties are involved--the FDIC as "Receiver," the purchasing bank, and the FDIC as insurer. "When a state bank fails and FDIC is tendered the appointment as receiver, it is statutorily obligated to accept the appointment ... Thus, FDIC cannot avoid acting in two capacities in a P & A transaction." 911 F.2d at 1470.[2]
 
 
 22
 In a P & A transaction, the assuming bank buys the assets of the failed bank that are of the highest banking quality. The assuming bank also assumes the deposit liabilities of the failed bank. As a result, the amount of deposit liabilities that the bank assumes is greater than the value of the assets it purchases. In order to make the purchase of the failed bank attractive to the assuming bank, FDIC/Receiver pays cash to the assuming bank in an amount sufficient to cause the assets the bank purchases to be equal to the liabilities it assumes, less some credit for the going concern value of the failed bank. The cash paid by the FDIC/Receiver to the assuming bank is paid from the FDIC/Corporation's insurance fund. In consideration for these funds, FDIC/Corporation acquires the assets of the failed bank that are not transferred to the assuming bank. FDIC/Corporation's "purchase" of the non-transferred assets is authorized by 12 U.S.C. Sec. 1823(c)(2)(A) (1988). FDIC/Receiver is authorized to offer the assets of the failed bank for sale to FDIC/Corporation by 12 U.S.C. Sec. 1823(d) (1988). Ultimately, then, FDIC/Corporation finances the P & S transaction by providing the funds with which FDIC/Receiver pays the assuming bank....
 
 
 23
 After FDIC/Corporation acquires the nontransferred assets in the P & A, it attempts to enforce and liquidate these assets to recoup its cash outlay and thereby minimize the loss to the insurance fund. In so doing, FDIC/Corporation may bring actions and prosecute claims in its own right. (Emphasis supplied). 911 F.2d at 1470.
 
 
 24
 The need for uniformity in the area of federal regulation is evident, and we concur in observations of the district court concerning the need for a uniform rule regarding assignments of properties to the federal regulators:
 
 
 25
 The federal scheme of bank regulation established by Congress ... simply could not function uniformly if the normal procedures of the Federal Deposit Insurance Corporation ... were limited by the various non-assignment rules of different jurisdictions. The need for uniform assignability of claims between the FDIC in its capacity as a receiver and the FDIC in its corporate capacity is unlike any other circumstance in which a party may attempt to assign claims arising out of a personal service contract. .... the procedures are essential to the rapid and efficient processing of bank failures to guarantee the continued availability of banking services to the general public.
 
 
 26
 (Vol. I Record, Item 5, p. 2, Order of 12/19/88)
 
 
 27
 In this case, as in the Bank of Boulder case, the transfer to FDIC in its corporate capacity was valid; FDIC, the Corporation, and not the FDIC, the Receiver, brought this suit, and the exception to federal jurisdiction does not apply.
 
 Facts
 
 28
 Turning to the question of defendants' liability in this action, we note that the FDIC claimed that the defendants negligently failed to uncover and prevent a fraud perpetrated against the bank by third parties. In particular, plaintiff alleged that defendants breached four duties owed by counsel to the bank--first, to exercise independent judgment without compromising loyalties of joint representation; second, a duty to investigate allegations of fraudulent activities; third, a duty to fully disclose the allegations of fraud to the board of directors; and fourth, a duty to advise the board of the legal significance of the allegations of the Rizzo complaint.
 
 
 29
 Under the evidence submitted at trial, the jury was entitled to find that the bank's losses arose from the following described factual situation:
 
 
 30
 The defendant attorneys represented the Aurora Bank in a number of matters from the time of its opening until the time it was closed by state regulators. Defendant Clark represented the organizers in establishing the bank; and, afterwards, represented the bank in its corporate affairs. He was a shareholder in the bank and served as its corporate secretary and as the bank's registered agent.
 
 
 31
 Defendant Swanson, with Clark, represented the bank in the lawsuit, described subsequently, which gave rise to this malpractice action--that is a federal lawsuit referred to by the parties as the "Rizzo case".
 
 
 32
 Clark and Swanson were partners in the firm of Neef, Swanson, Myer & Clark, that became the firm of Hamilton, Myer, Swanson, Faatz & Clark on January 1, 1986. Neef, Swanson, Myer & Clark were designated as the Bank's legal counsel at the annual meeting of the bank's shareholders in February, 1984.
 
 
 33
 The "heist money scheme" began in May, 1984. This involved the sale of $9 million of stolen currency, or "heist money," for payment of $2 million in "clean money." One John A. Napoli, Jr., assisted by others connected to organized crime, acted as the representative for the heist money seller and negotiated the terms of sale. The buyers were to be Dennis Nowfel, president of the Aurora Bank; Bill Vanden Eynden, the bank's vice-president; and Faud Jezzeny and Henrich F. Rupp, who worked together to obtain the $2 million purchase money from the Aurora Bank.
 
 
 34
 The vehicle used for defrauding the bank was a checking account there owned by Swiss American, Ltd., a company in which Rupp was the sole principal. Money from the Aurora Bank was fraudulently obtained in three ways:
 
 
 35
 a. Nowfel and Vanden Eynden approved fraudulent loans to out-of-state borrowers, including Anthony Del Vecchio and Jilly Rizzo, who were involved in the heist money scheme. These loans were made without collateral or adequate documentation and their proceeds were deposited to the Swiss American account and used to make payments on the $2 million purchase price for the "heist" money.
 
 
 36
 b. Forged checks or checks drawn on nonexistent accounts were deposited in the Swiss American account. Nowfel or Vanden Eynden approved the immediate withdrawal of these funds, which were paid over to Napoli. This ultimately created large overdrafts in the Swiss American account.
 
 
 37
 c. Some loans were made by the Aurora Bank directly to Napoli.
 
 
 38
 The entire scheme lasted seven months, and included numerous transactions by which Nowfel and his conspirators attempted to drain $2 million from the Aurora Bank.
 
 
 39
 Between July and October, 1984, the bank and its directors had no information about the scheme. Defendant Clark was the first to learn of it. On October 3, 1984, Clark, as the registered agent for the Aurora Bank, was served with a civil summons and complaint brought by Rizzo and Del Vecchio in the United States District Court for the District of Colorado against the bank, Nowfel "individually, and in his capacity as President and Chief Executive Officer of The Aurora Bank," and Jezzeny and Rupp, who were bank customers. Anthony J. Del Vecchio et al v. Heinrich F. Rupp, et al., No. 84-1937 (D.C.Colo.). By this suit, plaintiffs Rizzo and Del Vecchio sought to cancel their obligation to repay the $350,000 they had borrowed from the bank in July, 1984.
 
 
 40
 The jury could find that in their complaint, Rizzo and Del Vecchio accurately alleged that Nowfel had approved loans to them without financial affidavits, financial information or collateral; that the loans were collateralized by 500,000 shares of "World Wide Venture" stock which, due to restrictions, had no present value; that the loan to Rizzo was made without his presence and without an adequate power of attorney; that Jezzeny, as a part of the scheme, executed $600,000 in promissory notes payable to Rizzo and Del Vecchio; that $275,000 of the loan proceeds were deposited into the Aurora Bank account of Swiss American; that Rupp removed $300,000 in cash from this account, and that shortly thereafter Rupp informed Del Vecchio and Rizzo that he had been robbed of the loan money thus preventing plaintiffs' investment in Swiss American. The Rizzo complaint specifically alleged that the real purpose of the transactions was to provide a nominee loan by the bank to Rupp, without incurring any liability on his part, and that Nowfel was at all times acting as Rupp's agent. In particular, Paragraph 51 of the complaint described Nowfel's actions in this manner:
 
 
 41
 51. Said conspiracy to defraud the plaintiffs was furthered by defendant Nowful's (sic) intentional violation of federal statute and regulations designed to protect the Bank and its shareholders, including but not limited to loaning out sums in excess of reserve requirements of 12 U.S.C. 84(a)(1) and 12 C.F.R. Section 32.3, thereby rendering the Bank's board of directors potentially liable and 12 U.S.C. 936(b)(1) and rendering the Bank's franchise susceptible of forfeiture under 12 U.S.C. 93(a). (Exhibit, Paragraph 51, Complaint, Addendum to Appellees' Cross-Appeal and Answer Brief)
 
 
 42
 The Rizzo plaintiffs sought $300,000 actual and $300,000 consequential damages in addition to $1,000,000 punitive damages against the bank and Nowfel and others for "their acts of fraud attended by conduct that was wilful, wanton and recklessly in disregard of the rights and feelings of plaintiffs."
 
 
 43
 After defendant Clark was served with the complaint, he called Nowfel about it and Nowfel told Clark that it was simply a misunderstanding between borrowers and would be resolved. Clark did not inquire further, and neither Clark nor Swanson asked Nowfel any other questions about the Rizzo case.
 
 
 44
 On October 18, 1984, Clark made the following report to the board of directors of Aurora Bank, summarizing the facts in this manner:
 
 
 45
 Mr. Clark explained that the case primarily involves a dispute between customers of the Bank. However, the Plaintiffs are also seeking actual and punitive damages against the Bank and Dennis Nowfel as conspirators. Apparently the Plaintiffs' attorney has joined the Bank and Dennis Nowfel in order to put additional pressure on the other Defendants to clear up the case. It now appears that the loans of the Plaintiffs at the Aurora Bank will be paid in full by the Defendants and the case will be dismissed. Mr. Clark will keep the Board advised of progress in obtaining dismissal of the case.
 
 
 46
 The jury could find from the evidence that the board was not informed of the specific allegations of the complaint concerning the irregularities in making the loan, the inadequacy of the collateral, the disbursement of loan proceeds to Rupp and Rupp's withdrawal of $275,000 in cash. In this manner, the directors heard only Nowfel's version of the suit from the bank's attorney, Clark. The jury could also find that Clark did not apprise the board of the potential conflict of interest presented in view of the allegations made against the bank president.[3] There was evidence that the directors, had they been fully informed of the situation on October 18, would have undertaken a thorough investigation into the allegations of the Rizzo complaint, and would have discovered the fraud at that time.
 
 
 47
 Instead, the board saw no need for further action, and it received no additional information about the Rizzo suit until its meeting on November 15, 1984, when the board was informed that the case had been settled. (Ex. 3, at 1, Tr. Vol I, at 130).
 
 
 48
 An entry of appearance was filed by the Neef, Swanson, Myer & Clark firm in the Rizzo suit, whereby the firm entered its appearance "on behalf of Defendants The Aurora Bank ... and Dennis L. Nowful, individually and in his capacity as President and Chief Executive Officer of The Aurora Bank." Both Clark and Swanson signed this entry of appearance.
 
 
 49
 Defendant Swanson negotiated the settlement of the Rizzo suit, and under the evidence the jury could find that he, too, negligently failed to make an appropriate inquiry into the serious allegations raised in the complaint in that action.[4]
 
 
 50
 Because the board did not know the true facts, the fraudulent scheme continued. On October 29, 1984, Vanden Eynden approved a draw by John Napoli, Jr., for $80,000 against a line of credit. In late October, 1984, the defendant Swanson and the attorney for Rizzo and Del Vecchio reached a settlement of the Rizzo suit, which provided that all claims would be dismissed, that the Rizzo and Del Vecchio loans would be paid, and that the bank would cancel their notes.
 
 
 51
 On November 1, 1984, the loans were "paid off" by debiting the Swiss American account. This increased that account's overdraft by $362,471.20. Later, the notes were canceled and returned to Rizzo and Del Vecchio.
 
 
 52
 On November 8, 1984, John Napoli, Jr.'s friend, Michelle Propato, and his father, John Napoli, Sr., were given loans in the amount of $190,000 and $210,000, respectively. The proceeds of these loans were used to buy cashier's checks drawn to the order of Swiss American, signed by Vanden Eynden, and deposited to the Swiss American account. The entire sum was then withdrawn and delivered to Napoli, Sr., and Propato for delivery to Napoli, Jr.
 
 
 53
 On December 11, 1984, Rupp received another unsecured loan for $75,000; and on December 17, 1984, Napoli, Jr. drew a final $20,000 against his line of credit at the Aurora Bank.
 
 
 54
 The scheme began to unravel on December 12, when defendant Clark, and Whitlock, the chairman of the board of the bank, were advised by a bank competitor of a huge overdraft in one of the bank's accounts. The bank took immediate action to investigate the overdraft, confirmed it existed in the Swiss American account, and attempted to recover the amount of the overdraft from Rupp. The bank placed Nowfel under close supervision, and after an initial investigation, fired him.
 
 
 55
 The FDIC alleged that between the board meeting on October 18, and December 20, 1984, the bank sustained losses of $1,756,484.39 on account of the fraudulent activity.
 
 
 56
 In November, 1986, the FDIC brought an action in the United States District Court for the District of Colorado to recover funds diverted from the Aurora Bank through a scheme to defraud the bank in violation of the Racketeer Influenced and Corrupt Organization Act (RICO) and the Colorado Organized Crime Act. In this action twenty-nine claims were made against twenty-one defendants. Among these defendants were Del Vecchio, Napoli, Jr., Rizzo, Rupp, and William Vanden Eynden. Federal Deposit Ins. Corp. v. Antonio, 49 F.Supp. 1352 (D.C.Colo.1986, affirmed, 843 F.2d 1311 (10th Cir.1988).[5]
 
 Liability
 
 57
 Defendants contend that they cannot be liable in this action because if a client lies and defrauds its own attorney, then the client cannot recover from that attorney for negligence. In this manner, defendants seek to impute the fraud and dishonesty of Nowfel to the bank itself so that the FDIC, as successor to the bank, is barred by the fraudulent activities of the bank's employees. The trial court rejected this theory of imputed liability and estoppel because the bank had no contractual or fiduciary duty to protect the defendant attorneys from Nowfel's fraud. In this respect, the trial court explained that "(t)his is not a case ... where a principal liable for the fraudulent acts of its agents is attempting to profit from the fraud by suing innocent third parties."
 
 
 58
 In June, 1992, the Ninth Circuit reached a decision in FDIC v. O'Melveny & Meyers, 969 F.2d 744 (9th Cir.1992), which involved the nature of the professional relationship between attorneys and their corporate clients. Under California law, an attorney is required to perform with such "skill prudence and diligence as lawyers of ordinary skill and capacity commonly possess." There, the FDIC, as successor to an insolvent financial institution filed an action against legal counsel for professional negligence and breach of fiduciary duties, in connection with the firm's representation of the bank.[6]
 
 
 59
 In ruling that the district court improperly sustained the law firm's motion for summary judgment, the Ninth Circuit noted that the presence of fraud did not cancel an attorney's duty of due care; that the firm had a duty to make a "reasonable independent investigation" in order to detect and correct false information in the materials it reviewed; and that, in the face of wrongdoing by bank officers, the attorneys were not justified in assuming that the facts presented by those officers were true, since an attorney was required to make a "reasonable effort" to independently verify facts on which an opinion is based. In O'Melveny, the court likewise held that the FDIC was not estopped from recovering by reason of the bank officers' fraud, since the FDIC did not stand in the shoes of the bank. The court pointed out that the bank was the client, not the officers of the bank, and that there could be no attribution of fault to the bank because the insiders were working to benefit themselves and not the bank.[7]
 
 
 60
 In Federal Savings & Loan Insurance Corp. etc., v. McGinnis, Juban, Bevan, et al., (No. 89-327, M.D.La.1992), the district court followed the O'Melveny case in determining that the fraudulent conduct of bank officers cannot be imputed so as to bar an FDIC action for an attorney's malpractice. Under Louisiana law, an attorney is required "to exercise at least that degree of care, skill and diligence which is exercised by prudent practicing attorneys in his locality." In McGinnis, the attorney had been hired by the bank to prepare loan and mortgage documents, including a title search on real estate to be put up as collateral. It was alleged that the attorney had breached his duty in three ways--through a negligent title search, which failed to find a $1 million mortgage, by a failure to reveal crucial facts he knew concerning the borrower's shaky financial condition, and by violating his fiduciary duty to his client by failing to reveal what he knew to the bank's officers.
 
 
 61
 The district court in McGinnis denied the defendant's motion for summary judgment and dismissed all estoppel defenses based upon alleged criminal, fraudulent and negligent acts of the officers and directors of the bank, finding that such conduct could not be imputed to the FDIC.
 
 
 62
 In its memorandum opinion and order of June 30, 1989, the trial court here denied the motion for summary judgment filed by Clark and Swanson, and again denied directed verdict on issues which depended upon questions of fact, including whether or not the bank gave misleading information to its attorneys, whether Nowfel was acting as agent of the bank in his dealings with defendants, and whether Nowfel's fraud made it impossible for defendants to perform their duties to the bank. The scope of Nowfel's agency was specifically submitted to the jury under appropriate instructions, and the jury, by answers to special interrogatories, found that Nowfel and Vanden Eynden were not acting within the scope of their employment or agency with the Aurora Bank at the time in question. Special Verdict Form B, Question 11.
 
 
 63
 The court properly instructed that if an employee was acting within the scope of his authority then his fault would be attributed to the FDIC, standing in the shoes of the bank. If the employee was not so acting, then no negligence or fault would be attributed. The jury was also instructed that acts done to accomplish an independent purpose of the employee were not acts within the scope of employment. Vol. VIII Record, pp. 1362 et seq.
 
 
 64
 Defendants forcefully present the argument here that they were in fact the victims of Nowfel's fraud, that they were in no way responsible for the fraudulent scheme, and that they had no duty to ferret out and discover its nature. In this manner they misconstrue the nature of their professional duty under Colorado law.
 
 
 65
 Under Colorado law, "(a)n attorney owes his client a duty to employ that degree of knowledge, skill, and judgment ordinarily possessed by members of the legal profession." Myers v. Beem, 712 P.2d 1092, 1094, (Ct.App.Colo.1985), and see, Miami Intern. Realty Co. v. Paynter, 841 F.2d 348, 352 (10th Cir.1988).
 
 
 66
 Both parties in the case before us provided expert testimony concerning defendants' professional duties under the circumstances recited above, thus presenting a disputed factual issue for jury determination.
 
 
 67
 The district court noted that defendants offered nearly 100 liability phase instructions, which included 22 "defenses," few of which were supported by the evidence.
 
 
 68
 Instructions are to be given only if they are supported by authorities and the evidence presented at trial. Higgins v. Martin Marietta Corp., 752 F.2d 492, 496 (10th Cir.1985).
 
 
 69
 Presented with a bewildering array of conflicting, unsupported instructions, the trial court "reverted to the basic structure of instructions and well codified patterned Colorado Jury Instructions." (Memorandum Opinion 10/6/89, p. 9).
 
 
 70
 The jury was instructed that an attorney is negligent:
 
 
 71
 "... when he does an act within his profession which a reasonably careful attorney would not do, or fails to do an act which a reasonable careful attorney would do.
 
 
 72
 An attorney's conduct in this regard must be measured against what an attorney having and using that knowledge, skill and care of attorneys practicing law at the same time would or would not do under the same or similar circumstances. (Vol. 8 Record, pp. 1358-1359).
 
 
 73
 These instructions follow Section 15:19, Colorado Jury Instructions 2d. Standard instructions on causation were also given to the jury.
 
 
 74
 We agree that the court's instructions "adequately placed the applicable law before the jury." Ibid.
 
 
 75
 Under the evidence recited above, there was ample proof for the jury to find that defendants were negligent in their professional duties to the bank, and that their negligence was a cause of loss to the Aurora Bank.
 
 Proportionate Liability
 
 76
 The FDIC alleges that its claim was one for breach of implied warranty in a professional malpractice action, and thus was a breach of contract claim, not subject to Colorado's proportionate liability statute.[8]
 
 
 77
 By statute, Colorado abolished the general rule of joint and several liability in tort law and established procedures whereby a defendant may designate nonparties who may be at fault. Colo.Rev.Stat. Sec. 13-21-111.5. The Colorado court has held that the comparative negligence statute is applicable to pecuniary losses as well as to injuries to person or property. See Robinson v. Poudre Valley Fed. Credit Union, 654 P.2d 861, 863 (Colo.App.1982); Darnell Photographs Inc. v. Great American Ins., 33 Colo.App. 256, 519 P.2d 1225, 1226 (1974).
 
 
 78
 The trial court held that the negligence and contract claims of the FDIC should be merged into one hybrid "tort claim for malpractice."
 
 
 79
 As the trial court noted, the FDIC attempted to avoid the Colorado abolition of joint and several liability early on in this litigation. The trial court rejected this contention upon several grounds--first, that the FDIC failed to cite any authority to support the proposition that attorney malpractice sounds in contract; and second that, while the question of whether the relationship exists requires a general contract analysis, the question of whether one exercised a duty arising out of that contract sounds in tort. In addition, the Colorado Jury Instructions and Comments establish that Colorado approaches an attorney's breach of implied warranty as a hybrid of the standard tort claim for malpractice, sounding in negligence.[9] See Equilease Corp. v. State Federal S & L Ass'n, 647 F.2d 1069, 1074 (10th Cir.1981), holding that when a duty to take care arises from a contract, or irrespective of a contract, the action is one of tort.
 
 
 80
 It should also be noted that it has been held that when a duty to take care arises from a contract, or irrespective of a contract, the action is one of tort. See Equilease Corp. v. State Federal S & L Ass'n, 647 F.2d 1069, 1074 (10th Cir.1981).
 
 
 81
 Here it is clear that the jury apportioned fault solely upon a finding of negligence. The preliminary statement to the special question answered by the jury was put in this manner:
 
 
 82
 "If you find that the plaintiff did incur losses, and you further find that one or more of the defendants was negligent and that such negligence was a cause of any of the Plaintiff's losses, then answer the following questions: ..." (Emphasis supplied).[10]
 
 
 83
 Upon this jury finding of negligence, the trial court properly apportioned damages, charging Clark with 14% and Swanson with 5% of the loss resulting from their fault.[11]
 
 Damages
 
 84
 The FDIC sought a total damage award of $1,756,484.39. The jury deducted three transactions from this total--first, the amount of loans made by the Bank to Rizzo and Del Vecchio; second, the amount of two participations between the Aurora Bank and other banks; and third, the loan to John Napoli, Jr., made on October 19, 1984. Deducting these items, the jury found that the losses sustained by the bank were $914,013.19, $173,661.80 of which was attributable to defendants' fault.[12]
 
 
 85
 The FDIC contends that the damage phase of the trial was conducted improperly, resulting in a damage award on the Del Vecchio and Rizzo loans that was insufficient and inconsistent, that loan participations by the Market National Bank and the Commonwealth Bank in the Rupp loan were improperly deducted from the damages awarded, and that the verdict on the $80,000 Napoli, Jr., loan on October 29, 1984, is unsupported by the evidence.
 
 
 86
 An appellate court must determine whether a jury's special verdict can be reconciled on any reasonable theory consistent with the evidence. Furr v. AT & T Technologies, Inc., 824 F.2d 1537, 1545 (10th Cir.1987), rehearing denied, 842 F.2d 253 (1988).
 
 
 87
 As to the Rizzo and Del Vecchio loans, the FDIC contends that since the jury determined that Rizzo and Del Vecchio were each 3% responsible for the bank's losses, it is logically inconsistent and unfair to exclude those transactions in calculating damages. In this respect, the FDIC claimed as damages the entire amount of the Swiss American overdraft which was created after October 18, 1984, the date of the board meeting when defendant Clark failed to adequately advise the board concerning the Rizzo suit.[13] This overdraft included an amount debited by Nowfel to the Swiss American account on November 1, 1984, to "pay off" the Rizzo and Del Vecchio loans in settlement of the Rizzo suit. At trial, defendants argued that the Rizzo and Del Vecchio loans were losses incurred by the bank prior to October 18, 1984, because the actual loans were made in July, 1984.[14]
 
 
 88
 The FDIC limited its damage period from October 18, 1984, the date when Clark became aware of the Rizzo allegations, to December 20, 1984. The evidence was that Rizzo and Del Vecchio fraudulently obtained their loans on July 18, 1984. The jury could reasonably find that the loss to the bank occurred in July, before the defendants' liability arose.
 
 
 89
 We concur in the trial court's conclusion that the jury was entitled to find that Rizzo and Del Vecchio brought their suit against the bank to avoid payment on fraudulent loans made in July:
 
 
 90
 The evidence can be read to reflect that the money loaned left the bank prior to the filing of that lawsuit. Accordingly, the jury could have found that the loans amounted to damages suffered by the Aurora Bank prior to the time defendants could have stopped the ongoing fraud. (Vol I. Record, Item 14 Memorandum Opinion 10/6/89, p. 18).[15]
 
 
 91
 As to the loan made to John R. Napoli, Jr., on October 29, 1984, the evidence was that this loan was not entered on the books of the bank until December 14, 1984. The trial court appropriately noted that under the evidence the jury could find that the loss on this loan was attributable to the misconduct of other bank employees and that the jury's refusal to award damages on this item may be based upon a finding that the bank had failed to mitigate its damages.
 
 
 92
 There were two loan participation agreements made on the Swiss American, Ltd., account overdraft. The evidence presented at trial was that bank employees decided to convert the overdraft to a loan in the name of Heinrich Rupp, and that participation agreements were made with two banks to sell portions of the Rupp debt in order to lessen the debt load of the bank, so as to comply with statutory limitations.[16]
 
 
 93
 Throughout the proceedings below, the FDIC attempted to convince the trial court that the loan participations were a collateral source, but that court found that the loan participations were not analogous to insurance or other loss shifting agreements under the Colorado collateral source rule, Colo.Rev.Stat. Sec. 13-21-111.[17]
 
 
 94
 Under the evidence, we agree that the jury could find that the participations were sales of assets and that the Aurora Bank received income from the participating banks in exchange for the right to money received on the loan. See McVay v. Western Plains, 823 F.2d 1395, 1398-99 (10th Cir.1987). Under such circumstance it is clear that the evidence presented at trial would support the conclusion that the loss was suffered by the participating banks and not the Aurora Bank.[18]
 
 
 95
 The FDIC contends that the court erroneously excluded evidence on the effect of the participation agreements, leaving a misconception on the part of the jury as to their effect.
 
 
 96
 The trial court's exclusion of evidence is reviewed for an abuse of discretion. Perry v. Winspur, 782 F.2d 893, 894 (10th Cir.1986).
 
 
 97
 The only evidence excluded was that of the settlement agreement itself and the testimony of an FDIC employee regarding his interpretation of the document. The trial court excluded such evidence as injecting collateral matters into the case, finding that the evidence was more confusing than probative. In the memorandum order of October 6, 1989, the trial court adequately sets forth the tangled and confusing testimony which the FDIC hoped to introduce, and we find that the exclusion of such evidence was not an abuse of discretion on the part of the trial judge.
 
 
 98
 The issue of the effect of the participation agreement was clearly before the jury as a contested issue, and the verdict of the jury must stand.
 
 
 99
 There being no error, the judgment is AFFIRMED.
 
 
 
 *
 Honorable Wesley E. Brown, United States Senior District Judge, District of Kansas, sitting by designation
 
 
 [1]
 The 10th Circuit's first opinion, published in advance sheets at 858 F.2d 594, was withdrawn, and a second opinion was filed and reported at 865 F.2d 1134. A rehearing en banc was had with a third opinion reported at 911 F.2d 1466, reversing the decision of the district court
 
 
 [2]
 "... FDIC is given sole discretion to determine what method it will use to structure failed bank assistance transactions. 12 U.S.C. Sec. 1823(c)(2)(A) (1988) ..." 911 F.2d, f.n. 1 at p. 1469
 
 
 [3]
 It appears that Clark gave a copy of the Rizzo complaint to Whitlock, the chairman of the board. By special verdict, the jury found that Whitlock's negligence was responsible for 8% of the bank's loss
 
 
 [4]
 While Swanson testified that he had studied the Rupp loan file before negotiating the settlement, there was evidence that had he examined the loan file, in the light of allegations made in the Rizzo suit, he would have been put on notice that all was not right, since the stock used as collateral had a restrictive covenant on its face, there was no power of attorney in the file which would authorize Del Vecchio to sign the note for Rizzo, there were no financial statements or credit reports in the file, etc
 
 
 [5]
 It was alleged that as a part of the overall fraudulent scheme, one Aaron Mosko made an illegal loan of $50,000 to Vanden Eynden, who was barred by law from borrowing money from the Bank because of his status as an officer
 In the published opinion of the Antonio case the District Court entered a preliminary injunction enjoining Mosko from dissipating his assets. The 10th Circuit affirmed, finding in part that the FDIC had demonstrated substantial likelihood of prevailing on the merits.
 Judgments have been entered in the Antonio case against some of the defendants, including Jezzeny and Vanden Eynden (for treble damages of $10,732,626.11) and against Rupp (for $1,825,000).
 Dennis Nowfel was prosecuted criminally as a result of his participation in the scheme and following his plea of guilty, he was sentenced to two concurrent two-year terms of imprisonment. U.S. v. Nowfel, Case No. 87-CR-112 (D.C.Colo.1987).
 
 
 [6]
 In O'Melveny, the FDIC, as conservator of the bank, also filed suit against the bank owners, alleging RICO violations and breach of fiduciary duties
 
 
 [7]
 A case relied on by defendants, FDIC v. Ernst & Young, 967 F.2d 166 (5th Cir.1992) may be distinguished. There a claim was brought against accountants for negligence in auditing a financial institution. The owner of the institution had made false entries in the books to deceive the board of directors and regulators, and to defraud depositors and creditors. It was there held that the FDIC was subject to state law defenses, and that knowledge of the bank's management would be imputed to the FDIC, standing in the shoes of that institution. The Court particularly noted that the FDIC sued only on behalf of the institution, and not on its own behalf. It was also pointed out that neither the institution, nor its owner, relied on the audit. In so ruling, the court noted that the FDIC, as the bank's representative, could not claim that it should recover from the accounting firm for something that the bank was already aware of and chose to ignore, and that "(n)either can Western's assignee make the claim. The FDIC in its own capacity or Western's creditors might be able to make this claim, but the FDIC brought this suit only on Western's behalf." (Emphasis supplied)
 
 
 [8]
 Colorado's Proportionate Liability Statute provides in pertinent part that:
 In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage or loss.... (C.R.S. 13-21-111.5(1))
 The degree of negligence or fault of persons not parties to the action may also be considered by the jury. C.R.S. 13-21-111.5(3)(a).
 
 
 [9]
 Colorado Jury Instructions 2d provides in pertinent part that:
 15:19 NEGLIGENCE--PROFESSIONALS IN OTHER THAN A HEALING ART--NON-SPECIALIST--DEFINED (NEW)
 (An) [attorney] is negligent when he (does an act within his profession which a reasonably careful [attorney] would not do) (or) (fails to do an act which a reasonably careful [attorney] would do.)
 (An) [attorney]'s conduct in this regard must be measured against what (an) [attorney] having and using that knowledge, skill and care of [attorneys] practicing [law] at the same time would or would not do under the same or similar circumstances.
 Notes on Use
 This instruction ... should be used ... when there is sufficient evidence that the defendant, while acting as a practitioner of a profession other than a healing art, but not as a specialist in that profession, may have been negligent, and such negligence may have caused the plaintiff compensable harm.... (Emphasis supplied)
 
 
 [10]
 The jury was instructed to determine "what percentage of the negligence, if any, was that of those listed below. Enter the figure "0" for anyone you decide was not negligent or whose negligence you decide was not a cause of any of the Plaintiff's claimed losses". (Emphasis supplied)
 
 
 [11]
 The jury apportioned fault among others, all nondefendants, as follows: Del Vecchio, 3%, Jezzeny, 5%, Napoli, Jr., 4%, Rizzo, 3%, Rupp, 5%, Nowfel, 20%, Vanden Eynden, 28%, Whitlock, Chairman of the Board, 8% and 5 members of the Board at 1% each
 
 
 [12]
 The Special Verdict Form C returned by the jury provided this answer as to the amount of damages sustained by the Bank between October 18 and December 20, 1984:
 Overdraft in Swiss American Ltd. Account-- $419,013.19
Michelle A. Propato Loan 11/8/1984 190,000.00
John A. Napoli, Sr. loan 11/8/1984 210,000.00
John A. Napoli, Jr. Loan 10/29/1984 --0--
Heinrich F. Rupp Loan 12/11/1984 75,000.00
John A. Napoli, Jr. loan 12/17/1984 20,000.00
-------------------------------------------------------
 $914,013.19
 
 
 [13]
 The defendant did not request, and the jury was not asked to break down the damages based upon the overdraft in the Swiss American account
 
 
 [14]
 It appears that the FDIC claimed damages from the Swiss American account of $1,181,484.39. Defendants contended that the Rizzo and Del Vecchio loan balance of $362,471.20 and the loan participations, $400,000, should be deducted from the overdraft, and that the total loss should be $419,013.19. The jury awarded exactly that sum. Special Verdict Form C
 
 
 [15]
 As to Rizzo and Del Vecchio's liability, the jury could find that they acted as co-conspirators in furthering the fraud by their participation in an "under the table resolution" of their lawsuit. This would not be inconsistent with a finding that their loans, as a cause of loss to the bank, occurred in July, 1984
 
 
 [16]
 When the bank discovered the fraud in December, 1984, the Swiss American overdraft totaled $1,600,000, and Rupp, at the bank's insistence, executed notes for the entire amount. The Market National Bank and the Commonwealth Bank then each acquired a $200,000 participation in the Rupp loans
 
 
 [17]
 Under the Colorado statute, a "verdict shall not be reduced by the amount by which (the plaintiff) has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of such person."
 
 
 [18]
 The accounting effect of the settlement agreement, as explained by experts called by FDIC and the defendants, was subject to conflicting interpretations by those experts, thus presenting an issue for jury determination