INTERNATIONAL TELE–MARINE CORPORATION, f/k/a International Tele–Coin Company, Inc., Plaintiff,

v.

MALONE & ASSOCIATES, INC., a dissolved Colorado corporation, Brenman Raskin & Friedlob, P.C., a Colorado professional corporation, Edmund L. Epstein, and Donna A. Key, Defendants.

Civ. A. No. 93–K–1364.

United States District Court, D. Colorado.

March 7, 1994.

Robert Zupkus, Tod E. Fitzke, Zupkus & Ayd, Greenwood Village, CO, Alan P. Dagen, Brenner Dienstag & Dagen, Miami, FL, Edmund L. Epstein, Donna A. Key, Richard H. Goldberg, Brenman Raskin & Friedlob, Denver, CO, for plaintiff.

Robert T. McAllister, Kathryn H. Meyer, McAllister & Murphy, Denver, CO, for defendants.

Robert Malone, pro se.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This diversity action arises out a failed initial public offering of stock of Plaintiff International Tele–Marine Corporation, formerly International Tele–Coin Company ("ITC"). Defendant Malone & Associates, Inc. was hired to underwrite the offering and was represented in this regard by Defendant Brenman Raskin Friedlob & Tenenbaum, P.C. ("BRF"). Defendants Edmund L. Epstein and Donna A. Key are attorneys with BRF.

ITC alleges that Defendants breached their duty of loyalty and fiduciary duty to ITC, were negligent and breached their contracts with the company. BRF, Epstein and

Key move for summary judgment, claiming there is no genuine issue of material fact that they are not liable to ITC. ITC disagrees and files its own cross-motion for summary judgment. I grant BRF's motion as to the breach of contract claim, deny the remainder of the motion and deny ITC's motion for summary judgment.

## I. *Facts.*

In May 1990, ITC, a Florida corporation, sought additional cash resources to expand its business. It engaged Frank Ibarra of Capital Resources Financial Group, Inc. to locate a lead underwriter for a proposed initial public offering of 600,000 shares of ITC's common stock. Ibarra contacted Malone & Associates, Inc., a Colorado corporation then operating in Denver. In July 1990, Peter D. Bond, ITC's chief executive officer, Ibarra, Robert G. Malone, Malone & Associates' principal, and others met in Denver to finalize the details of Malone & Associates' underwriting of the offering. This meeting culminated in a letter agreement between ITC and Malone & Associates dated July 16, 1990 (the "Letter Agreement").

Under the Letter Agreement, ITC was to select competent counsel to prepare a registration statement and prospectus for filing with the Securities and Exchange Commission (SEC). ITC retained the Florida firm of Holland & Knight for this purpose. In addition, the Letter Agreement provided that ITC would register its stock under applicable Blue Sky laws, and that "Blue sky applications shall be prepared by counsel to the Underwriter [Malone & Associates] and all legal and other expenses shall be paid by the Company [ITC]." To comply with this provision of the Letter Agreement, ITC and Malone & Associates' counsel, BRF, entered into a separate agreement dated July 26, 1990 (the "Fee Engagement Letter"), under which ITC agreed to pay BRF's fees and costs for preparing the necessary Blue Sky filings in the states requested by Malone & Associates. BRF commenced this work on or about September 27, 1990.

During the time ITC was negotiating with Malone & Associates and BRF regarding underwriting the offering, Malone & Associates was the subject of an investigation by the National Association of Securities Dealers (NASD). On October 5, 1990, Malone & Associates received a letter indicating that its proposed settlement of the NASD investigation had been accepted. Under the settlement, three of Malone & Associates' employees, including Robert Malone, were censured and suspended from certain activities. Robert Malone was suspended from all activities for 15 days and restricted from acting in any principal or supervisory capacity with Malone & Associates for 75 days. Malone & Associates was also assessed a fine of $161,000.

ITC denies that either Malone & Associates or BRF informed it of the pending NASD investigation before the settlement was finalized. On October 8, 1990, however, BRF attorney Donna Key spoke with Adrienne Cornejo, an attorney with Holland & Knight, advising her of Malone & Associates' settlement with the NASD. That day, Key sent a facsimile to Cornejo suggesting that certain language disclosing the terms of the settlement be included in the SEC registration statement. Key then followed up with a letter dated November 6, 1990, which explained the NASD investigation and other matters in further detail. Malone & Associates was not represented by BRF in connection with the NASD regulatory action, but was represented by another Denver law firm.

On November 21, 1990, the registration statement prepared by Holland & Knight containing the disclosure of the NASD investigation was filed with the SEC. The disclosure stated that none of the regulatory matters to which Malone & Associates was subject materially affected the underwriter or its business. Shortly after the registration statement was filed, BRF filed the required Blue Sky applications.

On December 20, 1990, Malone & Associates became the subject of another regulatory matter. In a press release issued that day, the Office of the Comptroller of the State of Florida announced that it had instituted legal actions against a number of brokerage firms, including Malone & Associates, for violation of the state's securities laws. Shortly thereafter, J. Kevin Wood, an executive at Malone & Associates, telephoned Ibarra to notify him of the Florida action and

continued to update him on the status of the matter thereafter. In January 1991, Malone & Associates voluntarily ceased operations, preventing the ITC offering from going forward. Malone & Associates claimed that its cessation of business was due to adverse economic conditions brought about by the Persian Gulf war and was not caused by any adverse regulatory proceedings.

On October 6, 1992, ITC filed this action in Florida state court, alleging claims for (1) breach of the duty of loyalty (against all Defendants), (2) breach of fiduciary duty (against all Defendants), (3) negligence (against BRF, Epstein and Key), (4) breach of contract (against Malone & Associates) and (5) breach of contract (against BRF, Epstein and Key). ITC alleges that Defendants should have informed it of the regulatory investigation of Malone & Associates. By the time it was made aware of the investigation, ITC claims that it was too late and too expensive to retain another underwriter. Defendants removed the action to federal district court for the Southern District of Florida on January 29, 1993. By agreement of the parties, it was transferred to this district under 28 U.S.C. § 1404(a).

## II. *Choice of Law.*

This is a diversity action, and ITC pleads claims sounding under state common law. Consequently, before I can address the competing motions for summary judgment, I must determine which state's law applies, an issue which the parties make little attempt to address. BRF assumes that Florida law applies, since the action was originally commenced in that state. (*See* Mem. Br.Supp.Mot.Summ.J. at 7, n. 5.) ITC responds that

> it is illogical to assume that attorneys licensed to practice law in the State of Colorado, who are located in Colorado, subject to Colorado ethical rules and who perform legal services under a contract in Colorado would be subject to Florida law unless they acted in some way which would subject them to Florida law.

(Pl.'s Resp.Mot.Summ.J. at 15, n. 1.) It argues that "both Colorado and Florida law require BRF to act competently and with the same general degree of skill and care." (*Id.*)

■ Normally, a federal court sitting in diversity must apply the choice of law principles of its forum state. *See Shearson Lehman Bros., Inc. v. M & L Invs.,* 10 F.3d 1510, 1514 (10th Cir.1993). When an action has been transferred from another district under 28 U.S.C. § 1404(a), however, the court must apply the choice of law principles of the state in which the action was originally instituted. *See Van Dusen v. Barrack,* 376 U.S. 612, 639, 84 S.Ct. 805, 820, 11 L.Ed.2d 945 (1964); *Mitchell v. State Farm Fire & Casualty Co.,* 902 F.2d 790, 792–93 (10th Cir.1990). Therefore, I must follow Florida's choice of law principles.

■ Under Florida law, conflict of law questions are decided with reference to the Restatement (Second) of Conflict of Laws. *Judge v. American Motors Corp.,* 908 F.2d 1565, 1567 (11th Cir.1990); *Bishop v. Florida Specialty Paint Co.,* 389 So.2d 999, 1001 (Fla. 1980). Under the Restatement,

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
>> (a) the place where the injury occurred,
>>
>> (b) the place where the conduct causing the injury occurred,
>>
>> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>>
>> (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145 (1971); *see also Judge,* 908 F.2d at 1568. Under § 6 of the Restatement, the court must also consider, among other things, the relevant policies of the states with an interest in the litigation, the policies underlying the field of law at issue, and the need for predictability and uniformity of result. *See Judge,* 908 F.2d at 1568.

■ Applying these principles here, I find that Colorado has the most significant rela-

tionship to this dispute. ITC is a Florida corporation; its injury occurred in that state. Nevertheless, through its consultant, Ibarra, it solicited Malone & Associates in Colorado. ITC representatives and Ibarra travelled to Colorado to discuss the arrangements for underwriting the offering, and the Letter Agreement was negotiated here. The Letter Agreement required ITC to pay the expenses of BRF in ensuring Blue Sky compliance. BRF is located in Colorado and attorneys Epstein and Key are licensed in this state. The Fee Engagement Letter was drafted in Colorado, and all of BRF's legal services regarding Blue Sky compliance were performed in Colorado. Colorado has a significant interest in regulating the conduct of attorneys it licenses and who practice here. Florida has less of an interest, since BRF did not perform services in that state. For these reasons, under the factors delineated in the Restatement, Colorado law applies. *See Santos v. Sacks,* 697 F.Supp. 275, 284 (E.D.La.1988) (under Restatement, applying law of state where "virtually all of the services rendered" by the firm were performed).

### III. *BRF's Motion for Summary Judgment.*

BRF, Epstein and Key (collectively, "BRF") move for summary judgment on the first, second, third and fifth claims against them for breach of duty of loyalty, breach of fiduciary duty, negligence and breach of contract, respectively. BRF argues that (1) it had no duty to disclose to ITC Malone & Associates' regulatory problems, (2) ITC was, in fact, informed of the regulatory problems, (3) the regulatory problems were not the proximate cause of ITC's damages and (4) it did not breach its contract with ITC. ITC responds that it was not informed of Malone & Associates' settlement with the NASD until that settlement had been accepted. It argues that as a matter of law BRF had a duty to disclose facts material to its public offering, including the pendency of regulatory enforcement proceedings, or at minimum there is a material issue of fact as to the scope of BRF's relationship with ITC and its duty to disclose certain matters. ITC further maintains that there is a factual dispute

whether the failure to disclose was the proximate cause of ITC's damages.

■ I first consider whether BRF had a duty to disclose to ITC that Malone & Associates was facing regulatory action by the NASD before the settlement was accepted. ITC's first three claims for breach of the duty of loyalty, breach of fiduciary duty and negligence are predicated on the existence of an attorney-client relationship between ITC and BRF which creates the duty to disclose. If there was no such relationship, then these claims fail as a matter of law. *See Williams v. Burns,* 540 F.Supp. 1243, 1252 (D.Colo. 1982) (seller's claim against potential buyer's attorney for breach of fiduciary duty fails for lack of a confidential trust relationship between the parties); *Schmidt v. Frankewich,* 819 P.2d 1074, 1079 (Colo.App.1991) (rejecting concept that attorney is liable to third-party beneficiary of attorney-client relationship except in circumstances of fraud or malice).

■ Under Colorado law, an attorney-client relationship is based upon contract which may be express or implied from the conduct of the parties. *People v. Razatos,* 636 P.2d 666, 671 (Colo.1981); *Schmidt,* 819 P.2d at 1077. In either case, the parties must agree on all essential terms of the relationship, as evidenced by the parties' manifestations of mutual assent. *Schmidt,* 819 P.2d at 1077. Whether an attorney-client relationship exists is a question of fact for the jury. *See Admiral Merchants Motor Freight, Inc. v. O'Connor & Hannan,* 494 N.W.2d 261, 265 (D.Minn.1992); *Winstead v. Berry,* 556 So.2d 321, 324 (Miss.1989); *Cornell v. Wunschel,* 408 N.W.2d 369, 378–79 (Iowa 1987); *Gillespie v. Klun,* 406 N.W.2d 547, 556 (Minn.App.1987). ITC, the party claiming the relationship, bears the burden of establishing it. *Dunham v. Dunham,* 204 Conn. 303, 528 A.2d 1123, 1132 (1987).

In this case, the Letter Agreement and Fee Engagement Letter are persuasive written evidence of the relationship between the parties. The Letter Agreement refers separately to Underwriter's counsel (counsel for Malone & Associates) and counsel for the Company (ITC's counsel), defining the duties of each. For example, Malone & Associate's

duty to pay for the shares issued by ITC was "subject to the approval of Underwriter's counsel." (Mem.Br.Supp.Mot.Summ.J., Ex. B–2 at 2.) On the other hand, ITC was to "select counsel qualified and experienced in the preparation of filings under the Securities Act to prepare the Registration Statement...." (*Id.* at 3.) Additional duties of Underwriter's counsel are described in paragraph 4 of the Letter Agreement, which states:

> The Underwriting Agreement, the agreement among underwriters, the participating dealers agreement and related documents (the "Underwriting Documents") will be prepared by the Underwriter's counsel, and the Underwriter's counsel shall make all required filings with the NASD with respect to the proposed public offering. With respect to these filings, the Company shall supply to the Underwriter's counsel five copies of the Registration Statement, at least four of which shall include exhibits, for filing with the NASD, accompanied with respect to the initial filing by a certified or cashier's check in the appropriate amount payable to the NASD for the filing fee.
>
> All corporate proceedings undertaken by the Company and other legal matters which relate to the public offering and other related transactions shall be satisfactory in all material respects to the Underwriter's counsel.

(*Id.* at 4.) In addition, ITC agreed to register its stock under Blue Sky laws for sale in those states selected by Malone & Associates. In this regard, the Letter Agreement provided that

> Blue sky applications shall prepared by counsel to the Underwriter and all legal and other expenses in connection therewith shall be paid by the Company. The Company shall enter into a written agreement with counsel to the Underwriter for payment of legal fees and expenses.... To the extent blue sky work is undertaken by counsel to the Underwriter pursuant to this paragraph, it shall be separately billed

to the Company and shall be the financial obligation of the Company.

(*Id.* at 7.)

The Fee Engagement Letter between ITC and BRF echoes this arrangement. Drafted by BRF, it opens with the statement: "This letter is to set forth our arrangement concerning payment of legal fees and costs with respect to the qualifications and filings under the state securities or "Blue Sky" laws which are necessary in connection with your current proposed public offering of securities." (*Id.*, Ex. B–2 at 1.) The letter goes on to provide an estimate of the fees and costs for registering the securities in the states selected by Malone & Associates and the advisability of submitting an application for listing on the Pacific Stock Exchange. In exchange for ITC's agreement to pay fees and costs, BRF agreed "to do the necessary work in order to attempt to qualify [ITC's] offering of securities in the states listed above and in other states that the Underwriter may request in which it seems likely that the offering could be qualified," (*id.* at 2), to "use its best efforts to qualify [ITC's] securities in all of the states requested by the Underwriter," (*id.* at 3), and to "provide a Blue Sky Memorandum for the Underwriter and the Company summarizing the states in which your issue may be sold," (*id.*).

At this point, the Letter Agreement and the Fee Engagement Letter are consistent. They both indicate the parties' intent simply to shift the cost of legal fees and filing expenses in connection with Blue Sky laws from Malone & Associates to ITC, an arrangement which BRF contends is common in the securities industry. The very specific delineation in the Letter Agreement between the duties of Underwriter's counsel and counsel for the Company supports BRF's characterization of the parties' agreement as simply one for fee-shifting. Yet other language in the Fee Engagement Letter throws this characterization into question. In one of the final paragraphs, BRF states:

> We may withdraw *as counsel for you* and terminate this agreement by notifying you in writing.... If permission for withdrawal from employment is required by Court rules, this firm shall withdraw only

after receiving permission from the Court. Upon withdrawal of BRFT *of representation of you,* you shall immediately pay any remaining balance owed on your account.

(*Id.* at 3–4) (emphasis added). ITC also relies on the affidavit of Peter Bond, its chief executive officer, in which he states that ITC "retained BRF to be our attorneys" because it was required to under the Letter Agreement, that the company "reposed its trust and confidence in BRF that they would adequately and completely represent our interests," and that it "expected that BRF would keep us advised of information which we would need to pursue the offering," including information regarding Malone & Associates' regulatory problems. (Pl.'s Resp. Mot.Summ.J., Ex. A at 2, 3.)

While arrangements of this sort may be common practice in the securities industry, as this case illustrates, they are not without pitfalls. BRF's inclusion of language in the Fee Engagement Letter referring to its "representation" of ITC and providing the procedures for withdrawal of that representation sheds doubt on otherwise clear contractual language that its agreement with ITC was limited to the payment of fees and costs.

■ "[T]he mere payment by another of legal fees does not necessarily create an attorney-client relationship with that person." Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 7.2 at 362 (3d ed. 1989). Likewise, a would-be client's subjective state of mind in believing an attorney-client relationship has been created is generally irrelevant. *Id.* § 8.2 at 404; *United States v. Keplinger,* 776 F.2d 678, 700 (7th Cir.1985), *cert. denied,* 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986). In certain circumstances, however, the relationship may be implied where the attorney led the would-be client reasonably to expect he was being represented. *Cf., Parker v. Carnahan,* 772 S.W.2d 151, 157 (Tex.App.1989). "If the belief was induced by the lawyer, then an *objective* standard should apply concerning the reasonableness of the belief based upon the attorney's conduct." Ronald E. Mallen & Jeffrey M. Smith, *supra,* § 8.2 at 96 (Supp.1993).

Here, there is evidence upon which a jury could conclude that ITC reasonably believed that BRF had agreed to represent it, especially in light of the final language of the Fee Engagement Letter. Had BRF intended to limit its duties to ITC, it could and perhaps should have disclosed that intent in the Fee Engagement Letter. *Cf. Parker v. Carnahan,* 772 S.W.2d at 157 (attorney should have informed non-client that he was not representing that person's interest if attorney knew that a reasonable person would mistakenly have believed that the attorney was providing representation). Thus, while it may have been obvious that BRF was representing Malone & Associates as "Underwriter's counsel" pursuant to the Letter Agreement, and while fee-shifting arrangements may be common in the securities industry, the existence of an attorney-client relationship between ITC and BRF must be resolved by the jury. Therefore, summary judgment is inappropriate on the issue of the existence of an attorney-client relationship.

■ BRF goes on to argue that, even assuming such a relationship, the scope of its representation of ITC was limited to the preparation of Blue Sky filings, which it completed competently, and did not extend to disclosure of any pending regulatory matters which Malone & Associates faced. Again, this is a jury question. *See David B. Lilly Co. v. Fisher,* 800 F.Supp. 1203, 1209–10 (D.Del.1992) (jury question whether counsel limited the scope of attorney-client relationship to exclude certain issue).

■ There is little doubt that an attorney may agree to perform work of limited scope. Correspondingly, whether an attorney has breached its duty to the client depends upon whether the duty fell within the scope of the attorney's employment. *See* Ronald E. Mallen & Jeffrey M. Smith, *supra,* § 8.2 at 407; *Maillard v. Dowdell,* 528 So.2d 512, 514–15 (Fla.App.1988), *rev. denied,* 539 So.2d 475 (Fla.1988). Yet,

> even though an attorney can limit the scope of the representation, one cannot disregard circumstances which provide reasonable notice that the client may have legal problems or remedies which fall outside the scope of the undertaking. Al-

though the attorney need not represent or counsel the client concerning such matters, the client should be informed of the need for legal assistance and that the attorney will not be providing such services.

*See* Ronald E. Mallen & Jeffrey M. Smith, *supra*, § 8.2 at 408 (footnote omitted); *see also Daugherty v. Runner*, 581 S.W.2d 12, 17 (Ky.App.1978).

Here, there is evidence upon which a jury could conclude that BRF should have disclosed Malone & Associates' problems with the NASD. Under the Letter Agreement, BRF, not Holland & Knight, was to handle filings with the NASD. Therefore, ITC reasonably could have believed that matters relating to the pending investigation were within the allegedly limited scope of BRF's engagement. At minimum, there is a question whether BRF should have informed ITC of the potential conflict with Malone & Associates and that its representation of ITC was limited solely to the preparation of Blue Sky filings and extended no further. Consequently, issues of the scope of BRF's representation and the adequacy of its disclosures are not amenable to summary judgment.

BRF next argues that, even assuming it was acting as ITC's attorney, the undisputed facts show that it fully complied with its duty to disclose. BRF asserts that "[i]n August 1990, [Malone & Associates] disclosed to ITC pending regulatory proceedings relating to [Malone & Associates], including an investigation by the National Association of Securities Dealers of alleged markups involving the securities of Chartwell Cable Fund." (Mem. Br.Supp.Mot.Summ.J. at 3; *see also id.*, Ex. A, ¶ 17.) ITC vehemently disputes this assertion, submitting the affidavit of Peter Bond and Frank Ibarra denying any such disclosure. (*See* Pl.'s Resp.Mot.Summ.J., Ex. A at 2, 3; *id.*, Ex. C at 2). Therefore, there is a disputed issue of fact whether Malone & Associates informed ITC of the NASD investigation before October 1990.

■ While this factual dispute may be relevant to Malone & Associates' liability for nondisclosure, with respect to BRF's motion for summary judgment, the focus is on what BRF knew and when. Donna Key, an attorney with BRF, admits to having known of

the NASD investigation no later than July of 1990. In addition, there is no dispute that BRF did not inform ITC of the settlement of the investigation until it was accepted by the NASD in early October 1990. Key further states, however, that

[p]rior to October 8, 1990, representatives of [Malone & Associates] had informed BRF that [Malone & Associates] had discussions with ITC representatives in Florida in August 1990. in which [Malone & Associates] disclosed the pending investigation by the NASD, which later resulted in the Acceptance Waiver and Consent dated October 2, 1990. BRF had no reason to believe that [Malone & Associates] had not made such disclosure to ITC in August 1990.

(Reply Br.Supp. BRF's Mot.Summ.J., Ex. D at 1–2.)

■ Even accepting this statement as true, there is a factual question whether BRF reasonably could rely on Malone & Associates' representation that it had informed ITC of the regulatory problems in deciding itself not to disclose them to ITC until they were made public. The affidavit of ITC's expert, Ted J. Fiflis, indicates that BRF breached its duty of care in not disclosing these matters before accepting the alleged representation of ITC. (*See* Pl.'s Resp. Mot.Summ.J., Ex. D at 1.) In malpractice actions, whether an attorney exercised a reasonable degree of care or skill in representing its client is a question of fact often determined through expert testimony and seldom decided as a matter of law. Such is the case here. *See FDIC v. Clark*, 768 F.Supp. 1402, 1407 (D.Colo.1989), *aff'd*, 978 F.2d 1541 (10th Cir.1992); *Gelsomino v. Gorov*, 149 Ill. App.3d 809, 104 Ill.Dec. 1, 4, 502 N.E.2d 264, 267 (1986). BRF cannot establish as a matter of law that it breached no duty to ITC.

■ BRF's next argument is that ITC's claims fail as a matter of law because Malone & Associates' regulatory problems were not a proximate cause of the damages ITC suffered by the failure of the offering to go forward. BRF contends that Malone & Associates was unable to underwrite the offering and subsequently went out of business

not as a result of the NASD investigation and settlement or the litigation commenced by the Florida Comptroller's Office, but because of operating losses brought on by the adverse economic conditions in the securities industry created by the war in the Persian Gulf. BRF submits the affidavits of Wood and Key to support this contention.

In response, ITC notes that it is undisputed that Robert Malone was suspended for 75 days from acting in any principal or supervisory capacity and that Malone & Associates was assessed with a $161,000 fine approximately 60 days before the firm ceased operations. ITC maintains, correctly, that there is a genuine issue of fact whether these events were a material factor in Malone & Associates cessation of business. Therefore, BRF is not entitled to summary judgment based on the absence of causation.

Finally, BRF argues that ITC's allegations do not support its claim for breach of contract because ITC has not identified any manner in which BRF failed to fulfill its obligations under the Fee Engagement Letter. In its complaint, ITC states only that BRF "breached the contract [it] had with ITC by failing to render the agreed upon legal services in a skillful, competent and professional manner." (Compl. ¶ 40.) In later pleadings, ITC has failed to specify which legal services BRF failed to perform adequately. A fair reading of these pleadings indicates that the breach of contract claim is simply plead as an alternative to the malpractice claim alleged in preceding paragraphs of the complaint.

Under Colorado law, while the attorney-client relationship is based in contract, a claim based on a violation of a duty imposed by that relationship sounds in tort. *FDIC v. Clark*, 768 F.Supp. at 1411. A claim based on breach of the attorney-client contract itself is cognizable; however, it must be based on a specific term in the contract. *Id.* ITC does not contest that BRF completed the Blue Sky filings contemplated under the Fee Engagement Letter. Consequently, ITC's breach of contract claim is premised solely on its contention that BRF failed to adhere to its alleged duty to disclose the regulatory proceedings facing Malone & Associates. As so characterized, it fails as a matter of law. Therefore, the breach of contract claim must be dismissed.

### IV. *ITC's Cross–Motion for Summary Judgment.*

In its response opposing BRF's motion for summary judgment, ITC alternatively suggests that it is entitled to summary judgment on all of its claims against BRF. For the reasons outlined above, there are disputed issues of material fact concerning the existence of an attorney-client relationship between ITC and BRF, the scope of that relationship, whether BRF adhered to the standard of care required of attorneys, and whether BRF's alleged failure to disclose was a proximate cause of ITC's damages. Accordingly, ITC's motion for summary judgment must be denied.

IT IS ORDERED THAT the motion for summary judgment of Defendants Brenman Raskin & Friedlob, P.C., Edmund L. Epstein and Donna A. Key is DENIED as to the first, second, and third claims for relief and GRANTED as to the fifth claim for relief. Plaintiff International Tele–Marine's cross motion for summary judgment is DENIED.