Timothy C. HOILES, Plaintiff and Counterclaim Defendant,

v.

Joseph M. ALIOTO, Defendant and Counterclaim Plaintiff,

v.

Elizabeth Davison, Gail Sanchez, and Jill K. Hoiles, Additional Counterclaim Defendants.

No. CIV.A. 04–F–438 OES.

United States District Court, D. Colorado.

Nov. 15, 2004.

Peter M. Susemihl, J. W. Downie, Susemihl, McDermott & Cowan, PC, Colorado Springs, CO, Kenneth Barry Siegel, William T. Hankinson, Sherman & Howard, Denver, CO, for Plaintiff.

Tarek Fathi M. Saad, Morrison & Foerster, Denver, CO, for Defendant.

## ORDER ON MOTION TO DISMISS COUNTERCLAIM AGAINST ELIZABETH DAVISON, GAIL SANCHEZ AND JILL K. HOILES

FIGA, District Judge.

Additional Counterclaim Defendants Elizabeth Davison, Gail Sanchez and Jill K. Hoiles move to dismiss the claims against them brought by Defendant Joseph Alioto (Dkt.# 82–1). Elizabeth Davison is the former wife of Plaintiff Timothy Hoiles. Gail Sanchez and Jill K. Hoiles are their daughters. Plaintiff Timothy Hoiles has alleged claims based on a fee dispute stemming from the representation by Mr. Alioto of Mr. Hoiles in conjunction with obtaining fair compensation for his

shares in Freedom Communications, Inc. ("Freedom"). Freedom was a privately owned media conglomerate. It apparently owns and operates 28 daily newspapers, numerous weeklies, four magazine titles and eight broadcast television stations.

Mr. Alioto claims that his representation extended beyond assisting Mr. Hoiles secure top dollar for his 511,211 shares in Freedom to include the 56,907 Freedom shares held by his wife, and 49,416.75 shares in Freedom each held by Gail Sanchez and Jill Hoiles, totaling collectively approximately 667,000 shares. Mr. Alioto entered into a contingent fee agreement with Mr. Hoiles to represent him in the matter. However, the agreement however fails to specifically reference any of the additional counterclaim defendants (also referred to summarily as the "Davison Defendants") as clients, and none of them are signatories to the agreement. The principal question posed by the motion is whether their absence from and non-involvement in the formation of the contingent fee agreement bars Mr. Alioto's claims against them. The Court finds that it does in part.

## BACKGROUND

### The Retention of Mr. Alioto and His Work

Mr. Hoiles, who lives in Colorado Springs, met with Mr. Alioto in California to secure legal services to liquidate his minority interest in Freedom at the best price that could be obtained. Mr. Hoiles' 511,211 shares in Freedom, when combined with the 155,740.5 owned by the Davison Defendants, totaled about 8.6% the company. It is alleged that the Davison Defendants "authorized Mr. Hoiles to attempt to bring about the sale of their Freedom shares . . . ." Counterclaim, ¶ 14. (The paragraph references to the Counterclaim are interchangeable as between the Counterclaim as set forth in the original answer and in the answer to the Amended Complaint.) As the Counterclaim relates,

Mr. Alioto undertook substantial efforts to convince the other Freedom shareholders to buy Mr. Hoiles' and the Davison Defendants' shares for a "fair and competitive" price. Such communications included detailed memoranda and a draft complaint. Negotiations ensued with Freedom's Board of Directors, and Mr. Alioto claims to have undertaken related efforts as part of an orchestrated strategy that included enlisting a broker in the United Kingdom to seek purchase of other shareholders' interests as part of a "pincer operation" to obtain maximum value for Mr. Hoiles and his family. (*See* Counterclaim, ¶ 29.)

After lengthy and detailed machinations culminating in October 2003, Mr. Alioto claims to have played a significant role in securing a price of $142,000,000 for the 667,000 shares at issue, or approximately $212.71 per share, allegedly exceeding Mr. Hoiles original goal by a factor of five. (Counterclaim, ¶ 42.) Apparently two capital venture/equity firms were authorized to implement a recapitalization and reorganization plan, which may well have come about through the efforts of other shareholders and the creation of a special committee of independent Freedom directors. Shareholder approval for this transaction was obtained on December 17, 2003, when Mr. Hoiles allegedly "knew, understood and believed" that Mr. Alioto had fully performed under the contingent fee agreement and was entitled to his fee. (Counterclaim, ¶ 45.)

### The Contingent Fee Agreement and the Dispute as to the Davison Defendants

All's well that ends well, but that is not what happened here. As a result of the completion of the recapitalization, Mr. Alioto wanted a contingent fee that he calculated to be in excess of $20,000,000. Mr. Hoiles, his ex-wife and his daughters contend, among other things, they owe him nothing-indeed, Mr. Hoiles wants a return

of the money he handed over to Mr. Alioto during the course of the representation. The Davison Defendants assert that even if Mr. Alioto were entitled to a fee, the fee is owed by Mr. Hoiles, not them, and certainly it should not be a contingent fee percentage set forth in the only written fee agreement pertinent to this case.

The contingent fee agreement is dated August 17, 2001. Mr. Hoiles signed and returned it on or about March 1, 2002 after consultation with other counsel. (Counterclaim, ¶ 18.) It is written on the letterhead of the Law Firm of Joseph M. Alioto and addressed to Timothy C. Hoiles only. It starts out: "Dear Tim, This letter sets forth the bases upon which my firm will represent **you** in the Freedom Communications **matter**." (Emphasis added.) The terms of the representation included payment of a $500,000 non-deductible nonrefundable retainer, which had already been paid. Mr. Alioto would receive 15% of anything recovered before the filing of a complaint, 20% of anything recovered after the filing of a complaint but before the commencement of a trial and 25% of anything thereafter. (For ease of discussion, Mr. Alioto personally, as opposed to his law firm, is referred to as a party to this agreement as he is the party asserting the Counterclaim and did not sign the agreement as a representative of his law firm. The agreement does say that "my firm will represent you.") The agreement further calls for reimbursement of the out-of-pocket expenses of Mr. Alioto to be paid out of a fund maintained at the $50,000 level. Costs were not to be deducted from the recovery for purposes of calculating the attorneys fee. If Mr. Hoiles withdrew from or dismissed the contemplated lawsuit against Freedom contrary to Mr. Alioto's recommendation, Mr. Hoiles agreed to pay Mr. Alioto a "reasonable" attorney fee based upon $1,000 per hour for Mr. Alioto's time and $500 per hour for the time of his co-counsel.

Some things are not referenced in this contingent fee agreement. It makes no mention of the quantity or ownership of the Freedom shares for which Mr. Alioto was tasked with obtaining consideration. It does not mention the Davison Defendants at all. It does not identify anyone except for Mr. Hoiles as the client. There is no place for the signatures of the Davison Defendants or for any other potential client besides Mr. Hoiles. The letter agreement does not reference Mr. Hoiles acting in a representative capacity for anyone else. In several places in the agreement Mr. Alioto refers to "you" or "your," presumably Mr. Hoiles, the sole addressee and client signatory of the letter. *See* Ex. A to the Amended Complaint in opening and last two sentences and paras, 2, 3, 4, 5, 7 and 8 (*e.g.*, "You have the sole authority to settle the case on your behalf.").

*The Counterclaim*

The causes of action pertinent to the Davison Defendants set forth in Mr. Alioto's "Counterclaim" include claims for (1) declaratory relief that Mr. Alioto is entitled to 15% of the amounts recovered from the sale of the shares held by the Davison Defendants; (2) breach of contract in that Mr. Hoiles executed the contingent fee agreement with actual and apparent authority to act as the agent for their shares as well as his; (3) unjust enrichment because of Mr. Alioto's reliance upon the awareness of the Davison Defendants that he was working on their behalf as well as Mr. Hoiles' to secure fair consideration for their Freedom shares; and (4) conversion of monies to which Mr. Alioto would otherwise be entitled to as fees. In addition, Mr. Alioto asserts fraud and negligent misrepresentation as two alternative causes of action solely against Mr. Hoiles if he does not prevail on his claims against the Davison Defendants.

*Mr. Hoiles' Claims*

To give better context to the Counterclaim and the motion to dismiss, Plaintiff Hoiles' assertions bear description. Mr. Hoiles denies that Mr. Alioto recovered anything that would constitute the contemplated contingency. What was ultimately received came from third-party investors purchasing interests in the company for $212.71 per share, something Mr. Alioto allegedly did not bring about and indeed opposed. (Amended Complaint, ¶ 6.) He claims that Mr. Alioto therefore is not entitled to a contingent fee at all under the circumstances. Even worse, according to Mr. Hoiles, Mr. Alioto wants such a fee based upon an oral 20% contingent fee agreement based on the total consideration received from his and the Davison Defendants' shares, or $28.4 million, rather than 15% because no lawsuit had been filed. (*Id.*; however, the Counterclaim stakes out no such position.) Besides saying that the Davison Defendants and their interests were not part of the representation (*see e.g.*, Amended Complaint, ¶¶ 10, 11), Mr. Hoiles demands a return of fees and expenses already paid on the grounds that they were obtained through false representations. He also contends that Mr. Alioto is not entitled to any contingent fee because his actions did not produce the consideration for Freedom shares that resulted from the recapitalization and that Mr. Alioto failed to comply with Chapter 23.3 of the Colorado Rules of Civil Procedure, which governs contingent fee agreements in the state. As a result, Mr. Hoiles further contends that Mr. Alioto wrongfully asserted an attorneys' lien as to $21,292,170 of Mr. Hoiles' funds (15% of the total received by him and the Davison Defendants). That forced Mr. Hoiles to enter into an involuntary escrow agreement that has withheld the funds from him since May 18, 2004. (Amended Complaint, ¶ 36.) Mr. Hoiles wants moratory or the highest statutory rate of interest on the loss of use of this money while it is sitting in escrow. He also seeks related declaratory and equitable relief.

*What the Counterclaim Avers*

The Counterclaim states or implies the following as pertinent averments as to the additional counterclaim defendants. They are accepted as true for purposes of the motion to dismiss:

The Davison Defendants desired to sell their shares in Freedom and obtain a fair market price for them. (¶ 3.) Mr. Alioto reasonably believed that Mr. Hoiles had the authority to engage him with regard to the sale of all approximately 667,000 Hoiles family shares in Freedom, including those owned by Mr. Hoiles' former wife and his daughters (¶ 19). Mr. Alioto's efforts resulted in effecting the sale of shares owned by the Davison Defendants. He was never directed to limit his activities to Mr. Hoiles' shares only and the Davison Defendants knew of, ratified and consented to Mr. Alioto directing his efforts to secure the sale of all 667,000 shares (¶¶ 19, 59, 60). Those efforts to bring about results sought by the Davison Defendants were considerable (¶ 20). Mr. Hoiles knows and has privately acknowledged and admitted to his ex-wife and daughters that they owe and are liable to Mr. Alioto for their respective portions of the contingent fee (¶ 45). The Davison Defendants have repudiated any obligation they may have had to Mr. Alioto (¶¶ 1, 5, 54, 78).

## WHICH STATE'S LAW GOVERNS?

■ This district court must apply the law of the forum state, including its conflicts of law principles, to satisfy the *Erie* doctrine in this diversity case. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.,* 315 F.3d 1271, 1281 (10th Cir.2003).

However, "choice of law in a given case is not made once for all issues; each issue is to receive separate consideration if it is one that would be resolved differently under the local law rule of two or more of the potentially interested states." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 946 F.Supp. 861, 866 (D.Colo.1996).

■■■■ Colorado courts resolve choice of law issues governing contracts using the "most significant relationship" approach of the *Restatement (Second) of Conflicts of Law* (1971), §§ 6,[1] 188.[2] *Century 21, supra*, 315 F.3d at 1281; *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 198 Colo. 444, 601 P.2d 1369, 1372 (1979). The "most significant relationship" test is also used to evaluate which state's substantive law governs the commission of a tort under §§ 6, 145[3] of the *Restatement. See e.g., Dworak v. Olson Const. Co.*, 191 Colo. 161, 551 P.2d 198, 199–200 (1976); *Siemens Medical Sys., Inc. v. Nuclear Cardiology Sys., Inc.*, 945 F.Supp. 1421, 1425–26 (D.Colo.1996). For conflict purposes, unjust enrichment falls somewhere between contract and tort. *Chase Manhattan Bank, N.A. v. CVE, Inc.*, 206 F.Supp.2d 900, 906 (M.D.Tenn.2002). The Court presumes Colorado would apply the pertinent "most significant relationship" test from the *Restatement* for that cause of action as

1. § 6 Choice–Of–Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

 (a) the needs of the interstate and international systems,

 (b) the relevant policies of the forum,

 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

 (d) the protection of justified expectations,

 (e) the basic policies underlying the particular field of law,

 (f) certainty, predictability and uniformity of result, and

 (g) ease in the determination and application of the law to be applied.

2. § 188 Law Governing in Absence of Effective Choice by the Parties

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

 (a) the place of contracting,

 (b) the place of negotiation of the contract,

 (c) the place of performance,

 (d) the location of the subject matter of the contract, and

 (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

3. § 145 The General Principle

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

 (a) the place where the injury occurred,

 (b) the place where the conduct causing the injury occurred,

 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

 (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

well. *See* §§ 6, 221.[4] *See also, Restatement (Third) of the Law Governing Lawyers* § 1, comment 3 (2000) ("In general, traditional choice-of-law principles such as those set out in the Restatement Second of Conflict of Laws, have governed questions of choice of law in nondisciplinary litigation involving lawyers.").

■ Applying these tests, the Court finds that Colorado has the most significant relationship to the facts at issue. The additional counterclaim defendants live in Colorado. *See* Counterclaim, ¶¶ 9, 10 and 11. The contingent fee agreement was executed in part in Colorado. It does not contain a choice of law provision indicating which state's law governs nor does it indicate where performance under the contract was to occur. In the Order on Pending Motions entered August 3, 2004, the Court set forth a number of factors indicating that Colorado possessed long-arm jurisdiction over Mr. Alioto in these circumstances. Aspects of some of those factors militate in favor of Colorado having the most significant relationship to the Counterclaim. Predominating factors include the protection of justified expectations (§ 6(2)(d)); the place of alleged negotiation and performance by the Davison Defendants of the alleged contract (§ 188(2)(b) and (c)); the domicile and residence of the Davison Defendants (§§ 188(2)(e), 145(2)(c) and 221(2)(d)); the

place where the Davison Defendants' conduct causing the alleged injury occurred (§ 145(2)(b)); and where the benefit or enrichment was received (§ 221(2)(b)).

Mr. Alioto points out that applying the *Restatement (Second) of Conflict of Law* (1971) to this transaction, particularly § 196, leads to the conclusion that California law governs. That *Restatement* section points to the law of the state where all or a major portion of the services are to be rendered as the law to apply in a contract setting. California, Mr. Alioto asserts, is where the major portion of services were to be performed, where his law office is located, where he is licensed to practice law, where Freedom is located and where the contemplated lawsuit against Freedom was to have been filed if it had gotten to that point.

All these statements may be true, and the Court accepts them as true for purposes of the motion to dismiss. However, two factors especially tip the scales in favor of Colorado having the most significant relationship to the causes of action in the Counterclaim. The first is that by undertaking legal representation of Mr. Hoiles, and purportedly of the Davison Defendants as well, Mr. Alioto undertook fiduciary duties on behalf of one or more Colorado clients. Colorado has a strong interest in protecting its citizens who enter (or who are alleged to have entered)

---

4. § 221 Restitution

(1) In actions for restitution, the rights and liabilities of the parties with respect to the particular issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,

(b) the place where the benefit or enrichment was received,

(c) the place where the act conferring the benefit or enrichment was done,

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

into relationships with attorneys who purport to act as their fiduciaries. This is particularly true where, as here, the scope and non-financial terms of the representation were ill-defined at best. Certainly Chapter 23.3 of the Colorado Rules of Civil Procedure, governing contingent fee agreements, reflects particular concern by the state in protecting its citizens from overreaching by attorneys in the context of contingent fee arrangements they enter into. Conversely, it would seem inequitable to subject Colorado residents to California substantive law simply on the say so of a California lawyer claiming to have entered into a client-lawyer relationship with Colorado "clients" where it is not claimed that they have either signed or were even shown any engagement agreement, and where the facts as pled by the lawyer do not reveal any willingness by them, directly or indirectly, to be governed by California law.

The second factor is that the Counterclaim is not based fundamentally upon what Mr. Alioto did in California or did not do in Colorado. Rather it is the conduct of the Davison Defendants, admittedly Coloradans, in not paying Mr. Alioto what he claims they owe him under a variety of theories. Because the performance (or rather the wrongful nonperformance) by the additional counterclaim defendants gives rise to the Counterclaim, their being Colorado citizens strongly suggests that the wrong, if one occurred, happened in Colorado given their resistance in paying Mr. Alioto anything.

## DO COLORADO'S RULES GOVERNING CONTINGENT FEE AGREEMENTS NONETHELESS APPLY TO A CALIFORNIA LAWYER NOT ADMITTED TO PRACTICE IN COLORADO AND WORKING LARGELY OUTSIDE THE STATE?

■ The above finding that Colorado's substantive law applies to the Counterclaim means that Chapter 23.3 of the Colorado Rules of Civil Procedure governs the contingent fee agreement. This is true even if Mr. Alioto was not a member of the Colorado Bar. First, Chapter 23.3 is, of course, the law of Colorado governing contingent fee agreements. Second, there are no limitations in the rules under Chapter 23.3 so as to render them inapplicable to out-of-state lawyers in these circumstances. Finally the *Restatement (Third) of the Law Governing Lawyers*, § 3 (2000) allows a lawyer to provide legal services to a client "at a place within a jurisdiction in which the lawyer is not admitted to the extent the lawyer's activities arise out of or are reasonably related to the lawyer's practice" where the lawyer has been admitted. Given this recognition of lawful multistate practice even in jurisdictions where a lawyer has not been admitted, there is no reason to exempt the lawyer from the practice requirements of such non-admitting jurisdictions.

## WAS THERE SUBSTANTIAL COMPLIANCE WITH CHAPTER 23.3 OF THE COLORADO RULES OF CIVIL PROCEDURE?

■ There is no basis for enforcing the contingent fee agreement against the Davison Defendants under Colorado law. Rule 6 of Chapter 23.3 states: "No contingent fee agreement shall be enforceable by the involved attorney unless there has been substantial compliance with all of the provisions of this Chapter 23.3." Here the Davison Defendants did not sign the contingent fee agreement as required by Rule 4(b). If nothing else, Chapter 23.3 requires putative clients to have signed written contingent fee agreements as a prerequisite to having such contracts enforced against them. The absence of the Davison Defendants explicit assent to the contingent fee agreement renders it unenforceable against them as a matter of law.

## WHAT IS LEFT IN THE CONTRACT CLAIM?

 To the extent that the breach of contract claim is based on anything beyond the contingent fee agreement, it fails as well. Under Colorado law, an attorney-client relationship is based upon contract which may be express or implied from the conduct of the parties. *International Tele–Marine Corp. v. Malone & Associates, Inc.,* 845 F.Supp. 1427, 1431 (D.Colo. 1994); *People v. Razatos,* 636 P.2d 666, 671 (Colo.1981). The parties must agree upon all the essential terms of the relationship, as evidenced by the parties' manifestations of mutual assent. *International Tele–Marine Corp., supra,* 845 F.Supp. at 1431; *Schmidt v. Frankewich,* 819 P.2d 1074, 1077 (Colo.App.1991). While the issue of contract formation, including the formation of client-lawyer relationship, is usually one of fact, here the Counterclaim fails to aver facts indicating any assent to a contractual arrangement between the Davison Defendants and Mr. Alioto.

 Moreover, the "apparent authority" basis for the contract claim also fails. The Counterclaim lacks any factual assertion that the alleged principals, the Davison Defendants, gave any indication to Mr. Alioto that Mr. Hoiles was their agent. Apparent authority is created by operation of law where there is evidence of written or spoken words or other conduct of the *principal* which, reasonably interpreted, causes a person to believe that the principal consents to have the act done on his or her behalf by a person purporting to act on behalf of him or her. *People v. Manning,* 672 P.2d 499, 507 n. 8 (Colo.1983) (adopting § 8 of the *Restatement (Second) of Agency* (1958)); *In re Marriage of Robbins,* 8 P.3d 625, 628 (Colo.App.2000). Simply receiving copies of communications between Mr. Alioto and Mr. Hoiles and whatever Mr. Hoiles may have told Mr. Alioto do not, as a matter of law, constitute apparent authority for Mr. Hoiles entering into a contract with Mr. Alioto on behalf of the Davison Defendants. The Davison Defendants' motion to dismiss the contract claim is GRANTED and the contract claim is DISMISSED as to them.

## THE CONVERSION CLAIM

The conversion claim as pled is less than compelling, even without taking into account other pleadings that suggest that the money is being held in escrow. Mr. Alioto has noted that the money in dispute is the subject of an attorney charging lien. *See* Counterclaim, ¶ 49. The entire case boils down to a simple fee dispute (albeit one involving sums having more zeros than most) and the Counterclaim in essence says Mr. Alioto has not been paid what the Davison Defendants and Mr. Hoiles owe him. As a matter of law, that does not rise to the tort of conversion where an unliquidated unpaid debt is claimed and the claimant never exercised dominion over identifiable proceeds. *See e.g., Byron v. York Inv. Co.,* 133 Colo. 418, 296 P.2d 742, 745 (1956); *Johnson v. Studholme,* 619 F.Supp. 1347, 1350 (D.Colo.1985), *aff'd,* 833 F.2d 908 (10th Cir.1987). The Davison Defendants' motion to dismiss the conversion claim is also GRANTED and that claim DISMISSED as to them.

## THE UNJUST ENRICHMENT CLAIM

On the other hand, the Counterclaim does set forth a well-pled unjust enrichment cause of action under Colorado law. As recognized most recently in *Bedard v. Martin,* "unjust enrichment is a theory of recovery that involves an implied contract at law when the parties either have no express contract or have abrogated it." 100 P.3d 584, 591–92 (Colo.App.2004), citing *Dudding v. Norton Frickey & Assocs.,* 11 P.3d 441, 444–45 (Colo.2000). "In general, a party cannot recover for unjust enrichment by asserting a quasi-contract

when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract." *Id.,* citing *Interbank Invs., LLC v. Eagle River Water & Sanitation Dist.,* 77 P.3d 814, 816 (Colo.App.2003). Sometimes a lawyer is precluded as a matter of law from recovering a fee from a client under a *quantum meruit* or unjust enrichment theory where a contingent fee is deficient. *See e.g., Elliott v. Joyce,* 889 P.2d 43, 45–46 (Colo.1994).

Here, no express contract was sufficiently pled as between the Davison Defendants and Mr. Alioto. Therefore, under the holdings of *Dudding, supra,* 11 P.3d at 447, and *Olsen & Brown v. City of Englewood,* 889 P.2d 673, 677 (Colo.1995), Mr. Alioto may proceed in his attempt to recover the reasonable value of his services under a *quantum meruit* or unjust enrichment theory against the additional counterclaim defendants. *See also, Mullens v. Hansel–Henderson,* 65 P.3d 992, 999 (Colo. 2002); *Beeson v. Industrial Claim Appeals Office,* 942 P.2d 1314, 1316 (Colo. App.1997). The *Restatement (Third) of the Law Governing Lawyers* § 39 (2000) instructs: "If a client and lawyer have not made a valid contract providing for another measure of compensation, a client owes a lawyer who has performed legal services for the client the fair value of the lawyer's services." As the Colorado Supreme Court in *Mullens* stated:

> When an attorney completes the legal services for which he was retained, the fact that an underlying fee agreement was unenforceable does not in itself preclude the attorney from being paid the reasonable value of his services. When a contract fails, equity steps in to prevent one party from taking advantage of another. Quantum meruit, founded upon the principle of equity, exists to prevent unjust enrichment.... Not allowing an attorney to receive reasonable payment for completing legal services

agreed to by both the attorney and client to the benefit of the client, under a good faith belief that he would receive an agreed upon compensation for his services, solely because the contract was not in writing is inequitable and unjustly enriches the client.

65 P.3d at 999 (citations omitted). Some or even all of that dicta in *Mullens* may not apply to the facts as adduced at trial, including whether the Davison Defendants even were clients. Nevertheless, it at least supports the potential viability of the unjust enrichment cause of action in the Counterclaim as pled.

## CONCLUSION

The Motion to Dismiss (Dkt.# 82–1) is GRANTED insofar as the Counterclaim asserts causes of action sounding in contract and conversion, which claims are DISMISSED. The Motion to Dismiss is DENIED in all other respects. The declaratory relief claim as to the Davison Defendants is modified accordingly based on the above rulings. A jury trial is scheduled in this case to begin **Monday, April 18, 2005 at 1:30 p.m.** The Court reserves up to eight (8) trial days. The Final Trial Preparation Conference shall be held **Friday, April 8, 2005 at 4:00 p.m.**